UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Donald J. Coon,

        Plaintiff,

        v.                                                    Civil Action No. 2:13-cv-182

Southwestern Vermont Medical Center,
Shea Family Funeral Homes,
Lon McClintock, Esq.,

        Defendants.

## OPINION AND ORDER
(Docs. 7, 9, 29, 37, 49, 62, 70)

Plaintiff Donald J. Coon, proceeding *pro se*, brings this civil action against

Defendants Southwestern Vermont Medical Center (SVMC), Shea Family Funeral

Homes (Shea),[1] and Lon McClintock, Esq.  (Docs. 3, 17.[2])  Mr. Coon's claims stem from

the death of his mother, Joan M. Hunt, while she was an SVMC patient; from Shea's

actions following Ms. Hunt's death; and from Attorney McClintock's alleged breaches of

duties he owed to Mr. Coon during an investigation into Ms. Hunt's death.  In July 2013,

SVMC and Shea each filed a Motion to Dismiss or for Summary Judgment, asserting that

---

[1]  Shea notes that its proper corporate name is Shea Funeral Homes, Inc., but asserts that the distinction is not material to any issue in this case.  (Doc. 58-1 at 1 n.1.)

[2]  Mr. Coon filed his original Complaint on June 27, 2013.  (Doc. 3.)  He filed a notarized "Suppl[e]mental Original Complaint" on July 31, 2013 (Doc. 17), which the Court allowed as a Rule 15(a)(1)(B) amendment on August 8, 2013 (Doc. 21).

Mr. Coon's claims are time-barred under Vermont's statute of limitations, that he lacks standing to bring this action, and that he has failed to state a cause of action.  (Docs. 7, 9.)

In an Order filed on August 6, 2013, the Court requested supplemental memoranda of law on issues relating to the statute of limitations and Mr. Coon's standing to bring this action.  (Doc. 18.)  SVMC and Shea filed renewed motions and supplemental memoranda (Docs. 29, 37), and Mr. Coon filed responses (Docs. 40, 41).  In an Order filed on October 9, 2013, the Court converted SVMC and Shea's Motions into Motions for Summary Judgment.  (Doc. 52.)  In accordance with the Court's Order, SVMC and Shea each filed statements of facts and memoranda of law.  (Docs. 54, 54-1, 58, 58-1.)  Mr. Coon filed "final" responses on November 15 and 19, 2013, each of which includes statements of facts.  (Docs. 60, 61.)[3]

Attorney McClintock has also filed a Motion to Dismiss or for Summary Judgment.  (Doc. 49.)  Mr. Coon has filed a response (Doc. 50), and Attorney McClintock has filed a reply (Doc. 55).  Mr. Coon filed a "final" response on November 8, 2013.  (Doc. 59.)  Mr. Coon also filed a "Motion to Gain All Records of [Joan M. Hunt]" on January 13, 2014.  (Doc. 70.)  The Court held a hearing on all pending motions on January 15, 2014.

All parties have consented to direct assignment to the undersigned Magistrate Judge.  (Docs. 4, 10, 11, 48.)  For the reasons that follow, SVMC's Motion for Summary Judgment (Docs. 7, 29) is GRANTED; Shea's Motion (Docs. 9, 37) is GRANTED IN

---

[3]  SVMC has filed a Motion to Strike Mr. Coon's statement of facts for failure to include citations to the record, and because some of Mr. Coon's alleged "facts" are really legal conclusions.  (Doc. 62.) The Court DENIES the Motion to Strike as unnecessary.  The Court handles all of those issues using the procedures detailed in Fed. R. Civ. P. 56.

PART and DENIED IN PART; and Attorney McClintock's Motion (Doc. 49) is

GRANTED.  SVMC's Motion to Strike (Doc. 62) is DENIED; Mr. Coon's Motion to

Gain All Records (Doc. 70) is DENIED.

## Background

Although Defendants' pending Motions are now motions for summary judgment,

the facts presented by the parties in the Motions are focused primarily on the issues raised

in those Motions.  It is therefore helpful—for context—to begin by summarizing the

allegations in the original and Amended Complaint.[4]  The facts for the purposes of the

summary judgment Motions are set forth as necessary in the discussion below; they are

drawn from the parties' statements and other materials in the record, and are undisputed

except where noted.[5]

Mr. Coon alleges the following.  On or about January 25, 2010, Mr. Coon's

mother, Joan M. Hunt, was assaulted and robbed at her home in New York.  (Doc. 3 at 1–

2, 4; Doc. 17 at 1.)  The assailant was Joanne Becker (Doc. 3 at 4),[6] who is Mr. Coon's

---

[4] Ordinarily, an amended complaint supersedes the original and renders it of no legal effect.  *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977).  Here, however, Mr. Coon's Supplemental Amended Complaint (Doc. 17) omits the "Case Background" section that appears in his original Complaint (Doc. 3 at 1–3).  Because it is necessary to refer to the "Case Background" in the original Complaint to understand Mr. Coon's factual allegations, and given Mr. Coon's *pro se* status, the Court refers to both the original Complaint and the Amended Complaint for purposes of reciting Mr. Coon's factual allegations.

[5] Mr. Coon contends that, if the Court disagrees with his arguments against summary judgment, he should be entitled to conduct discovery.  (*E.g.*, Doc. 59 at 12; Doc. 60 at 10; Doc. 61 at 13.)  However, as to the facts material to the issues discussed below, the Court concludes that Mr. Coon has not shown that he is unable to present facts necessary to justify his opposition.  *See* Fed. R. Civ. P. 56(d).

[6] In its August 16, 2013 Order, the Court suggested that the assailant was not Ms. Becker, but was instead someone else.  (Doc. 18 at 1.)  In fact, Mr. Coon alleges that it was Ms. Becker who beat Ms. Hunt at her home in New York.  (Doc. 3 at 4.)

half-sister and Ms. Hunt's daughter (*id.* at 3).[7] Two days later, Ms. Becker went to

"check on" Ms. Hunt, expecting to find her dead. (Doc. 3 at 2; Doc. 17 at 1–2.) Instead,

Ms. Becker found Ms. Hunt critically injured but alive, and transported her to SVMC.

(Doc. 3 at 2; Doc. 17 at 1–2.) Ms. Hunt was in stable condition when Mr. Coon left the

hospital on the night of January 27, 2010. (Doc. 3 at 2.)

When Mr. Coon came back, Ms. Hunt had been injured a second time, again by

Ms. Becker. (*Id.* at 3; Doc. 17 at 2.) Ms. Becker had "held her hand over [Ms. Hunt's]

mouth and nose[,] smothering her." (Doc. 3 at 3.) Ms. Hunt died on or about January 30,

2010 as a result of Ms. Becker's assaults. (*Id.* at 3, 5.) The SVMC nurse assigned to care

for Ms. Hunt, who happened to be Mr. Coon's cousin,[8] allowed the second assault to

occur by leaving Ms. Hunt alone with Ms. Becker for hours in Ms. Hunt's hospital room.

(Doc. 3 at 2–5.)

Ms. Becker killed Ms. Hunt for Ms. Becker's own financial gain. (*Id.* at 3.)

"Immediately after" Ms. Hunt's hospitalization and death, Ms. Becker "t[ook] over [Ms.

Hunt's] identity," wearing Ms. Hunt's clothes and altering her hair to look like Ms. Hunt.

(*Id.* at 3, 4.)

After Ms. Hunt's death, Mr. Coon and his sister, Kim Diotte, twice requested an

autopsy, but "someone at [SVMC]" removed that request. (Doc. 3 at 5; Doc. 17 at 5.)

Then, "in the middle of the night" on or about January 30, 2010, and at the direction of

---

[7] In the course of discussing his mother in his original Complaint, Mr. Coon remarks that Ms. Becker "has a different father." (Doc. 3 at 3.) In other filings, he notes that Ms. Becker is not his "sister," but that she is his half-sister. (Doc. 40 at 7, 13, 21; Doc. 41 at 6, 9.)

[8] In its August 16, 2013 Order, the Court referred to the SVMC nurse as Ms. Hunt's cousin. (Doc. 18 at 1.) In fact, Mr. Coon describes the nurse as *his* cousin. (Doc. 3 at 2.)

Ms. Becker, Mark Shea of Shea Family Funeral Homes took Ms. Hunt's body to

Defendant Shea, which then cremated Ms. Hunt's remains without the consent of Mr.

Coon or his sister.  (Doc. 3 at 5; Doc. 17 at 3, 5.)  According to Mr. Coon, Ms. Becker

"had and has no right to speak for our family then or now."  (Doc. 3 at 5; Doc. 17 at 3.)

Thereafter, Mr. Shea produced bills that he said were owed by Ms. Becker, "over

charging and recharging for [the] same supposedly owed bill."  (Doc. 3 at 5; Doc. 17 at

5.)  On or about May 7, 2012, Mr. Shea stole the grave marker off Ms. Hunt's cemetery

plot in Buskirk, New York, and also damaged Ms. Hunt's and other Hunt family

members' graves.  (Doc. 3 at 6; Doc. 17 at 5.)  He did this on May 7, 2012—before the

Memorial Day festivities—specifically so that Ms. Hunt's family would see the damage

on Memorial Day weekend.  (Doc. 3 at 6; Doc. 17 at 5.)

Law enforcement commenced a criminal investigation into Ms. Hunt's death.

(*See* Doc. 3 at 5; Doc. 17 at 3.)  In an attempt to prevent anyone from discovering the

hospital's role in Ms. Hunt's death, SVMC would not release Ms. Hunt's medical

records, notwithstanding the fact that Mr. Coon had signed for the records and law

enforcement had obtained subpoenas for those records.  (Doc. 3 at 5, 7; Doc. 17 at 3, 6–

7.)  Lon McClintock, Esq.—who had been Mr. Coon's attorney for two years—became

involved in the investigation on SVMC's behalf, and divulged privileged attorney-client

information to SVMC, and conspired with SVMC to obstruct the murder investigation.

(Doc. 17 at 3–4.)

Mr. Coon, who is a New York resident (Doc. 3 at 1, 7; Doc. 17 at 1, 7), is Ms.

Hunt's oldest son.  (Doc. 3 at 5; Doc. 17 at 5.)  He "has suffered a big loss" as a result of

his mother's death, including "no parental guidance, no trips, [and] no dinners . . . ." (Doc. 3 at 5; Doc. 17 at 3.)  Mr. Coon seeks at least $2.5 million in damages from SVMC, and an additional $2.5 million in damages from Shea.  (Doc. 17 at 6–7.)

<u>Discussion</u>

## I.    Diversity Jurisdiction

Mr. Coon claims that the Court has jurisdiction pursuant to 28 U.S.C. § 1332 on account of the parties' differing states of residence.  (Doc. 17 at 1.)  SVMC does not dispute that the Court has diversity jurisdiction.  (Doc. 7 at 3; Doc. 29 at 3.)  Attorney McClintock's Motion (Doc. 49) does not raise any jurisdictional issue.  Shea maintains that the Court should dismiss most of Mr. Coon's claims against Shea on lack of standing, statute of limitations, or other grounds, and that Mr. Coon's remaining claims for wrongful conversion of a grave marker and overcharge or mischarge of fees for funeral services should be dismissed for lack of subject matter jurisdiction because the amount in controversy is less than § 1332's minimum of $75,000.  (Doc. 37 at 4.)  The Court addresses Shea's jurisdictional argument in the discussion that follows.

## II.   Mr. Coon's Wrongful-Death Claim Against SVMC

### A.    Standing

The Court begins with SVMC's argument that Mr. Coon lacks standing to bring his wrongful-death claim because he has not been appointed the personal representative of his mother's estate, which SVMC asserts is a requirement under both Vermont and New York wrongful death statutes.  (Doc. 7 at 3; Doc. 12 at 2; Doc. 29 at 6.)  Mr. Coon maintains that he "[is] the Estate" because by law "the oldest son handles [the] Estate."

6

(Doc. 8 at 2.)  He says that he "is always the person Surrogate Court sends bill collectors who want to sue [him]" and that his "is [the] only address they have on Mom's file." (Doc. 40 at 11.)  Mr. Coon confirms that he did pay fees to file in Surrogate's Court, but that after eight court hearings it was determined that all of Ms. Hunt's assets were stolen, missing, or gone, and that he was told to continue to handle the estate's business "same as I have done."  (Doc. 47 at 1–2; *see also* Doc. 60 at 11; Doc. 60-3 at 1.)  He asserts that he alone does all the work on the property that his mother owned, and that he pays all of the estate's bills and handles all of the estate's lawsuits.  (Doc. 60 at 9.)

Mr. Coon does not dispute the following additional facts asserted by SVMC and Shea.  In November 2011, Mr. Coon filed a petition for letters of administration with the Washington County (New York) Surrogate's Court.  (Doc. 54-8.)  The Surrogate's Court has not, however, issued letters of administration to Mr. Coon, and has not appointed him administrator or executor of his mother's estate.  Mr. Coon has not applied to any Probate Court in the State of Vermont for ancillary letters of administration regarding his mother's estate.

Both Vermont and New York law require that wrongful-death actions be brought by the personal representative of the decedent.  *See* 14 V.S.A. § 1492(a) (wrongful-death action "shall be brought in the name of the personal representative of such deceased person"); N.Y. Est. Powers & Trusts Law § 5-4.1(1) ("The personal representative, duly appointed in this state or any other jurisdiction, of a decedent who is survived by distributees may maintain an action to recover damages for a wrongful act, neglect or default which caused the decedent's death . . . .").

7

Mr. Coon does not contend that any court has issued to him letters to administer his mother's estate.  Instead, he relies on New York's "new surrogate laws" for the proposition that he "doesn't need to be appointed" by a court.  (Doc. 13-1 at 2.)  Indeed, there is a process in New York for the settlement of "small estates" without court administration.  *See* N.Y. Surr. Ct. Proc. Act §§ 1301–1312.  However, a "voluntary administrator" under that process has no power to enforce a claim for wrongful death.  *Id.* § 1306(3).  Thus to the extent that Mr. Coon asserts that he is a "voluntary administrator" of his mother's estate, that assertion is insufficient to establish his power to maintain a wrongful-death action against SVMC.  Because no court has appointed Mr. Coon as the personal representative of his mother's estate, he cannot maintain the wrongful-death action.[9]

Mr. Coon's wrongful-death claim should therefore be dismissed without prejudice for lack of capacity.  *See Estate of Vaiselberg ex rel. Vaiselberg v. Snow*, No. 02 Civ. 6235(DC), 2003 WL 1878248, at *1 (S.D.N.Y. Apr. 14, 2003) (dismissing employment discrimination case without prejudice for lack of capacity because the plaintiff, although he was the "voluntary administrator" for his mother's estate, lacked capacity to bring such a claim for "personal injuries").  For the reasons discussed below, Mr. Coon's wrongful-death claim should also be dismissed because, on the present facts, it is time-barred.

---

[9] This conclusion obviates the need to consider SVMC's additional argument that, even if Mr. Coon were appointed administrator in New York, he still lacks capacity to maintain the wrongful-death claim because he has not obtained ancillary letters of administration in Vermont.  (Doc. 29 at 6.)  The Court returns to that issue, however, in the course of discussing Mr. Coon's claims against Shea.

### B.    Statute of Limitations

SVMC and Mr. Coon both agree that the Court should refer to Vermont law in order to determine whether Mr. Coon's claim is time-barred.  The Court concurs.  "A federal court sitting in diversity jurisdiction applies the choice of law rules of the forum state."  *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012).  In Vermont, choice-of-law issues in tort actions are resolved using the approach set forth in the Restatement (Second) of Conflict of Laws.  *Martineau v. Guertin*, 170 Vt. 415, 417, 751 A.2d 776, 778 (2000) (citing *Amiot v. Ames*, 166 Vt. 288, 292, 693 A.2d 675, 677 (1997)).  For statute-of-limitations issues, it is necessary to refer to §§ 142 and 143 of that Restatement.  The gist of § 142 is that the local law of the forum determines whether the action is barred by the statute of limitations, except as stated in § 143.  Restatement (Second) of Conflict of Laws § 142 cmt. a (1971).  Section 143, in turn, provides that "[a]n action will not be entertained in another state if it is barred in the state of the otherwise applicable law by a statute of limitations which bars the right and not merely the remedy."  *Id.* § 143.  For the reasons that follow, the Court concludes that Mr. Coon's action is time-barred in Vermont.

Vermont law provides, in pertinent part, that a wrongful-death action must be commenced:

> within two years from the discovery of the death of the person . . . .  If the death of the decedent occurred under circumstances such that probable cause is found to charge a person with homicide, the action shall be commenced within seven years after the discovery of the death of the decedent or not more than two years after the judgment in that criminal action has become final, whichever occurs later.

14 V.S.A. § 1492(a).  As Mr. Coon repeatedly notes (Doc. 40 at 6, 13–14; Doc. 60 at 5),
section 1492(e)  provides: "[n]otwithstanding subsection (a) of this section, if the death of
the decedent was caused by an intentional act constituting murder, the action may be
commenced within seven years after the discovery of the death of the decedent."

Despite Mr. Coon's own belief that Ms. Becker murdered Ms. Hunt, the
alternative accrual date and seven-year limitations periods do not apply.[10]  No probable
cause has been found to charge a person with homicide for Ms. Hunt's death.  Neither has
there been any determination that her death was caused by an intentional act constituting
murder.[11]  Mr. Coon apparently asserts that this Court should make a determination about
whether Ms. Becker murdered Ms. Hunt.  (*E.g.*, Doc. 65 at 2.)  But determining whether
a "murder" has occurred is a criminal matter inappropriate for resolution in this civil
case.

The Court concludes that the date of accrual in this case was January 30, 2010—
the date that Mr. Coon discovered his mother's death.  Mr. Coon argues that he did not
learn "why how and who did the de[e]d"—i.e., the cause of her death—until October

---

[10]  Mr. Coon's assertion that a seven-year period applies (Doc. 60 at 9, ¶ 5) is a conclusion of law,
not a statement of fact, and thus cannot be utilized on a summary-judgment motion.  10B Charles Alan
Wright et al., Federal Practice and Procedure Civil § 2738 (3d ed. 2013).

[11]  There is no statute of limitations on murder in either Vermont or New York.  N.Y. Crim. Proc.
§ 30.10(2)(a); 13 V.S.A. § 4501(a).  Thus it is possible that at some future date a finding of probable
cause or an adjudication of murder might be entered.  However, the Court's analysis is constrained to the
facts as they exist now, and thus the Court's conclusion that Mr. Coon's wrongful-death action is time-
barred is without prejudice to a future showing that probable cause has been found or that a criminal case
for Ms. Hunt's murder has resulted in a conviction.

2011.  (Doc. 40 at 15.)[12]  That assertion is immaterial because the plain language of
§ 1492(a) sets the accrual date as the time the plaintiff discovers the death of the
decedent; the clock starts ticking whether or not the plaintiff knows the cause.  Thus, at
present, absent any tolling of the limitations period, January 30, 2012 was the deadline
for filing a wrongful-death case.  As noted above, Mr. Coon filed this case on
June 27, 2013.

Mr. Coon makes a number of arguments for equitably tolling the limitations
period.  "[T]he burden of proving that tolling is appropriate rests on the plaintiff."
*Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 512 (2d Cir.
2002) (citing *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000)).  In determining whether
equitable tolling is applicable, the Court considers whether Mr. Coon: "(1) has 'acted
with reasonable diligence during the time period [he] seeks to have tolled,' and (2) has
proved that the circumstances are so extraordinary that the doctrine should apply."
*Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80–81 (2d Cir. 2003)
(quoting *Chapman*, 288 F.3d at 512).  Equitable tolling is generally considered
appropriate: (1) "where the plaintiff actively pursued judicial remedies but filed a
defective pleading during the specified time period"; (2) "where plaintiff was unaware of
his or her cause of action due to misleading conduct of the defendant"; or (3) "where a
plaintiff's medical condition or mental impairment prevented [him] from proceeding in a

---

[12]  Mr. Coon asserts that the statute started to run on October 18, 2011.  (Doc. 60 at 9, ¶ 4.)  That
is a conclusion of law, not an assertion of fact.

11

timely fashion." *Id.* (internal quotation marks and citations omitted).  Here, Mr. Coon argues that all three circumstances are present.

Mr. Coon notes that he filed suit against SVMC in the United States District Court for the Northern District of New York on May 13, 2013, but that the Magistrate Judge said that the case against SVMC belonged in Vermont.  (Doc. 40 at 16; Doc. 40-2.)  It is true that equitable tolling can apply when a plaintiff timely filed a complaint in the wrong court.  *Haekal v. Refco, Inc.*, 198 F.3d 37, 43 (2d Cir. 1999) (citing *Burnett v. N.Y. Cent. R.R. Co.*, 380 U.S. 424 (1965)).[13]  Because Mr. Coon has only filed the first page of his complaint from the New York matter, it is not entirely clear whether he asserted substantially the same claims against SVMC as he now asserts against SVMC in this case.  However, even assuming that Mr. Coon's filing in New York is operative for statute-of-limitations purposes, it would only make the filing date May 13, 2013—still well after January 30, 2012.  To determine whether a filing on May 13, 2013 was within the limitations period, it is necessary to consider Mr. Coon's other tolling arguments.

Mr. Coon argues that SVMC's failure to deliver Ms. Hunt's hospital records was misleading conduct that effectively tolled the statute of limitations.  (Doc. 8 at 3; Doc. 13-1 at 1.)  According to Mr. Coon, "we didn't know anything . . . we didn't find out [until] Oct[ober] 2011 when [SVMC] released the records.  The statute of limitations started then and it hasn't been 2 years since the release of her [SVMC] hospital records."

---

[13] There is also a similar statutory tolling provision in Vermont.  *See* 12 V.S.A. § 558(a)(2). Whether it might apply to a wrongful-death claim is a potentially complicated issue.  *See Schulman v. Saloon Beverage, Inc.*, No. 2:13-cv-193, 2014 WL 127760 (D. Vt. Jan. 14, 2014) (analyzing whether § 558 applies to a dram shop claim).  The Court need not resolve that question in this case because § 558 only applies if the original action was timely commenced.

(Doc. 8 at 3; *see also* Doc. 13 at 4.)[14]  The parties' allegations concerning SVMC's

production of records are discussed in greater detail below, but are largely immaterial for

purposes of the statute of limitations.  Here, Mr. Coon himself admits that as early as

February 3, 2010, he believed that Ms. Becker had killed Ms. Hunt, and that SVMC was

at fault because his cousin, the SVMC nurse, was involved.  (Doc. 13 at 1; Doc. 16-2;

Doc. 40 at 14; Doc. 59 at 10, ¶ 3.)[15]  In short, nothing that SVMC did after

February 3, 2010 prevented Mr. Coon from becoming aware of his cause of action; by his

own admission he was already aware of it at that time.  Even assuming that SVMC took

longer than necessary to produce the documentation that Mr. Coon thought would help

prove his case, that would not have prevented Mr. Coon from filing his Complaint.

Finally, Mr. Coon argues that he was hospitalized eleven times from

November 14, 2012 through May 2013 and that during that period he could not have

"looked into or done anything to find out what these [defendants] were up to."  (Doc. 13-

1 at 1.)  He asserts that the statute of limitations was tolled until June 2013 when he was

sufficiently recovered to file suit.  (*Id.*)  However, SVMC correctly points out that Mr.

Coon's alleged medical incapacitation between November 2012 and May 2013 could not

toll a limitations period that otherwise expired on January 30, 2012.  (Doc. 29 at 11.)

---

[14]  Oddly, Mr. Coon also alleges that, when he was able to review the medical record, he found it "was no good" because "the chain of command was broken."  (Doc. 59 at 10, ¶ 12.)  Thus it is unclear how the medical records might have proved SVMC's liability directly.

[15]  There is a dispute about whether Mr. Coon shared his belief in a telephone conversation with Attorney McClintock on that date.  Mr. Coon says that he did.  (Doc. 59 at 10, ¶ 3.)  Attorney McClintock has no recollection of any such telephone conversation.  (*See* Doc. 54-5 at 9, ¶ 54.)  That dispute and related matters are discussed in greater detail below, but it is not material to the statute-of-limitations analysis.

More recently, Mr. Coon has supplied two unsworn letters purportedly from "Marvin Day RPA" of the Granville Family Health Center.  (Doc. 40-1; Doc. 51-1.)  The letters assert that the Granville Family Health Center is Mr. Coon's primary health care provider, recount hospitalizations in 2011, 2012, and 2013, and state that Mr. Coon was not healthy enough to be able to handle the business or estate of his mother during the entire period from 2010 through about June 2013.  (Doc. 40-1; Doc. 51-1.)  The Court cannot consider those letters, however, because they would not be admissible at trial.  *See Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 57 (2d Cir. 2012) ("In ruling on a motion for summary judgment, the district court may rely on any material *that would be admissible at trial*.") (internal quotation marks omitted; emphasis added); *see also Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005) ("[U]nsworn letters from physicians generally are inadmissible hearsay that are an insufficient basis for opposing a motion for summary judgment.").  Mr. Coon has therefore failed to meet his burden to prove medical equitable tolling.

For all of the above reasons, the Court concludes that Mr. Coon's wrongful-death claim against SVMC should be dismissed without prejudice.  Having reached that conclusion, the Court does not address SVMC's additional argument that the claim fails on its merits because SVMC is not liable for Ms. Becker's alleged criminal acts.  The

Court also need not decide whether Vermont recognizes loss-of-parental-consortium claims brought by adult children.[16]

## III.   Mr. Coon's Remaining Claims against SVMC and His Claims Against Attorney McClintock

Mr. Coon asserts the following claims against SVMC in addition to wrongful death: failure to respond to a criminal investigative subpoena (Doc. 17 at 3, ¶ 5A), conspiracy to withhold medical records (*id.* at 3–4), invasion of privacy (*id.* at 4, ¶ 7), and fraud (*id.* at 4–5, ¶ 10).  Mr. Coon brings similar claims against Attorney McClintock, as well as a malpractice claim.  It appears that Mr. Coon also alleges a tort claim based on the alleged removal of his requests for an autopsy.  (Doc. 3 at 5; Doc. 17 at 3.)  Each of these claims is the subject of SVMC and Attorney McClintock's Motions, and the Court treats them together here.  For all of these alleged torts, the Court applies Vermont law. *See* Restatement (Second) of Conflict of Laws § 145.[17]  The following additional facts relate to those claims and are undisputed except where noted.[18]

---

[16]  The Court asked the parties to supply briefing on that issue in its August 6, 2013 Order.  (Doc. 18 at 5.)  The Court perceived that it might be possible to argue that, pursuant to *Clymer v. Webster*, 156 Vt. 614, 596 A.2d 905 (1991), although Vermont's Wrongful Death Act permits parents to recover for damages for loss of companionship resulting from the death of their adult child (the facts of the *Clymer* case), the converse might not also be true.  SVMC does not make that argument (*see* Doc. 29 at 12), and it is in any case moot.

[17]  All parties agree that Vermont law should apply, and it appears that Vermont is the state that has the most significant relationship to the occurrence and the parties in this case.

[18]  Citations to the record are supplied throughout the factual background that follows.  This single statement of facts relates to Mr. Coon's remaining claims against SVMC as well as his claims against Attorney McClintock.  A single statement of facts makes sense here both because of the nature of the claims against SVMC and Attorney McClintock, and because many of the materials that SVMC cites in its Statement of Undisputed Material Facts (Doc. 54-1) are duplicates of materials cited by Attorney McClintock in his Statement of Undisputed Material Facts (Doc. 49-1).

Attorney McClintock worked as an attorney for Vermont Legal Aid between 1982 and 1988.  (Doc. 54-5 at 1, ¶ 3.)  It is undisputed for present purposes that, while working for Vermont Legal Aid, Attorney McClintock represented Mr. Coon in 1985 or 1986 regarding a claim for Social Security disability or SSI benefits, although Attorney McClintock maintains that he has no records and no specific recollection of representing Mr. Coon during that time or of the details of Mr. Coon's case or his personal or family circumstances.  (*See id.* at 1–2, ¶¶ 4–6, *id.* at 6, ¶ 32; *see also* Doc. 59 at 10, ¶ 1.)  According to Mr. Coon, during that time, Attorney McClintock had access to Mr. Coon's records relating to his medical and mental health as well as to his family's dynamics.  (*See* Doc. 16-2; Doc. 17 at 4, ¶ 6B.)  Attorney McClintock entered private practice in 1988 and his records show that he did not subsequently represent Mr. Coon at any time.  (*See* Doc. 54-5 at 3, ¶ 12.)

It is undisputed that in 2010 and 2011, SVMC was a client of Attorney McClintock's law firm, and that Attorney McClintock's responsibilities for the firm included advising the SVMC Medical Records Department on whether or how to respond to requests for medical records.  (Doc. 54-2 at 2, ¶ 4; Doc. 54-5 at 3, ¶¶ 16–17.)  According to Mr. Coon, he called Attorney McClintock on or about February 3, 2010, and they talked about Ms. Hunt's death at SVMC, SVMC's employment of Mr. Coon's cousin as Ms. Hunt's nurse, and Mr. Coon's planned legal suit against SVMC.  (Doc. 16-2; Doc. 50 at 1; Doc. 59 at 10, ¶ 3.)  Attorney McClintock has no recollection of any such telephone conversation.  (*See* Doc. 54-5 at 9, ¶ 54.)  He also asserts that if he had talked to Mr. Coon on that date, he would have said that he could not provide representation

16

because of the duties that he owed to SVMC, and would have recommended that Mr.

Coon consult another attorney. (*See id.* at 11, ¶ 71.)

According to Mr. Coon's sworn "final respon[s]e," he remained in contact with

Attorney McClintock after February 3, 2010, but at no time during 2010 or 2011 did

Attorney McClintock advise Mr. Coon that he was representing SVMC. (Doc. 59 at 10,

¶¶ 5, 6, 9.) Other affidavits that Mr. Coon has filed also report correspondence between

Mr. Coon and Attorney McClintock in 2010 and 2011. Julia Ruth Coon and Mr. Coon's

wife Riza Ali Coon both state in affidavits that "during the time after Mom[']s death in

2010 & 2011 I answered the telephone for Donald [f]our different times[.] It was

[Attorney] Lon McClintock. He and Donald talked for long periods of time[;] Donald

had to send him stuff." (Doc. 61-1 at 6; Doc. 64 at 5.)

Mr. Coon has filed copies of purported email exchanges between himself and

Attorney McClintock in 2010 and 2011. (Doc. 51-2.)[19] Curiously, contrary to Mr.

Coon's assertions that Attorney McClintock did not disclose that SVMC was a client,

some of the emails upon which Mr. Coon himself relies contain exactly such disclosures.

(*E.g.*, Doc. 51-2 at 1, 6 (purported February 11, 2010 email from Attorney McClintock

stating that SVMC "is a sometimes client"); *id.* at 2, 5 (purported July 8, 2010 email from

Attorney McClintock's firm stating "Attorney McClintock is unable to help you with this

matter . . . because he has handled previous matters for [SVMC]").) Other purported

---

[19] Those "Purported Emails" were the subject of this Court's Order dated October 30, 2013, in which the Court found that Attorney McClintock had offered evidence that put the authenticity of the emails in legitimate dispute, and authorized limited expedited ex parte discovery to help resolve the issue. (Doc. 57 at 5.) For the reasons that follow, the Court concludes that it is unnecessary to inquire further on this topic.

emails that Mr. Coon has offered appear to suggest that Attorney McClintock was interested in Mr. Coon's case against SVMC, was gathering information, and was seeking more information from Mr. Coon.[20]

Attorney McClintock maintains that Mr. Coon's only communications with him about potential claims against SVMC were an email Mr. Coon sent on October 9, 2011, a follow-up phone message on October 11, 2011, and emails that Mr. Coon sent on July 17 and July 25, 2013. (Doc. 54-5 at 8–11, ¶¶ 47–77.) Attorney McClintock asserts that he replied to the October 9, 2011 email on October 11, 2011, and stated that SVMC was a client and that he could not represent Mr. Coon. (*Id.* at 9, ¶ 56; Doc. 49-10.) He says that he did not reply to the phone message, (Doc. 54-5 at 10, ¶ 61), and that his paralegal replied to the July 17, 2013 email and stated that Attorney McClintock could not help Mr. Coon in a case against SVMC because of a conflict of interest, (*id.* at 10, ¶ 68; Doc. 49-12). Finally, Attorney McClintock says that he did not reply to the July 2013 emails. (Doc. 54-5 at 11, ¶ 75.)

According to Mr. Coon, he was at SVMC "six different times between January 30 2010 and Sept 10 2011 trying to get [Ms. Hunt's] records released." (Doc. 40-3 at 1.) SVMC asserts that it has no record of any request from Mr. Coon personally for his mother's medical records. (Doc. 54-2 at 2, ¶ 6.) It is undisputed, however, that on or

---

[20] (*See* Doc. 51-2 at 9) (purported February 21, 2010 email to Mr. Coon posing questions about the case and inquiring whether he has obtained legal counsel yet); (*id.* at 8) (purported March 5, 2010 email to Mr. Coon listing questions for him); (*id.* at 7) (purported June 14, 2010 email to Mr. Coon stating, "I haven't found anything new. I will keep my eyes [and] ears open and let you know what I find out"); (*id.* at 5) (purported July 8, 2010 email stating that Attorney McClintock "has many more questions of you"); (*id.* at 4) (purported July 12, 2011 email listing series of questions to Mr. Coon); (*id.* at 3) (purported October 12, 2011 email stating, "I will call you in the morning to discuss the things I see in this").

about March 18, 2011, SVMC received a subpoena from the Washington County (New York) District Attorney's Office requesting production of Ms. Hunt's medical records. (Doc. 54-4 at 1, ¶ 4; Doc. 54-5 at 3, ¶ 13; Doc. 54-9.)  The subpoena was forwarded to Attorney McClintock's firm for review for compliance with Vermont and federal law. (Doc. 54-5 at 3–4, ¶¶ 13, 18).  On March 24, 2011, Attorney McClintock advised SVMC not to produce Ms. Hunt's medical records because there was no authorization signed by a personal representative accompanying the request.  (Doc. 54-5 at 4, ¶ 21; Doc. 54-10.) Attorney McClintock advised the District Attorney's Office to supply a valid authorization, and on April 1, 2011 Attorney McClintock received an authorization signed by Mr. Coon.  (Doc. 54-5 at 4–5, ¶¶ 22–24; Doc. 54-11.)  On that same date, Attorney McClintock wrote to the District Attorney's Office to advise that the release was incomplete because it did not include the name and address of the person to whom the records were to be released.  (Doc. 54-5 at 5, ¶¶ 26–27; Doc. 54-12.)

On or about May 18, 2011, SVMC received a second subpoena dated May 12, 2011 from the Washington County (New York) District Attorney's Office. (Doc. 54-2 at 2, ¶ 5; Doc. 54-5 at 6, ¶ 29; Doc. 54-13 at 1.)  The second subpoena included a medical authorization form signed by Mr. Coon, as well as instructions to send the information to the Washington County District Attorney's Office at its Fort Edward, New York address.  (Doc. 54-2 at 2, ¶ 5; Doc. 54-4 at 2, ¶ 5; Doc. 54-5 at 6, ¶ 30; Doc. 54-13 at 2.)  On May 18, 2011, Attorney McClintock advised SVMC that the records could be released after someone had reviewed them for any information that could be degrading to the deceased.  (Doc. 54-4 at 2, ¶ 5; Doc. 54-5 at 6–7, ¶ 33; Doc. 54-14.)

Ms. Hunt's entire medical record was produced to the Washington County (New York) District Attorney's Office on September 20, 2011.  (Doc. 54-2 at 3, ¶ 8; Doc. 54-4 at 2, ¶ 6.)  The Court does not have the medical record before it, but according to Mr. Coon, the medical record "was no good" because "the chain of command was broken." (Doc. 59 at 10, ¶ 12.)

### A.  Failure to Respond to a Criminal Investigative Subpoena; Conspiracy to Withhold Medical Records

Mr. Coon asserts that SVMC either failed to disclose Ms. Hunt's medical records, or delayed doing so, and that as a result the criminal investigation was impeded and Ms. Becker was able to "get away with murder."  (Doc. 17 at 3.)  That claim fails for multiple reasons.  Initially, at least insofar as Mr. Coon seeks to attribute delay to Attorney McClintock, there is no indication that Attorney McClintock's involvement was designed to accomplish anything other than to ensure the proper handling of Ms. Hunt's medical records in compliance with state and federal law.  *See* 45 C.F.R. § 164.508 (generally requiring a "covered entity" to obtain a valid authorization prior to disclosing "protected health information"); 12 V.S.A. § 1612 (patient's privilege).  In fact, the evidence is that Attorney McClintock facilitated the disclosure of the records by advising the District Attorney's Office regarding the necessary steps to obtain the release.

Moreover, it is undisputed that SVMC did disclose the records on September 20, 2011.  As noted above, there is no statute of limitations on murder in New York or Vermont.  N.Y. Crim. Proc. § 30.10(2)(a); 13 V.S.A. § 4501(a).  Thus, even assuming that SVMC did delay production of the records, it could not have caused a

20

limitations problem for any murder prosecution, and Mr. Coon has not shown that any alleged delay has otherwise prejudiced such a prosecution.

Even if SVMC did delay producing the records and the delay did impact a murder prosecution, Mr. Coon could not obtain a remedy in this civil action.  In Vermont, failure to comply with a subpoena may be remedied by the contempt power of the court for which the subpoena issued.  *See* V.R.C.P. 45(e).  The subpoena did not issue for this Court, nor is Mr. Coon a party to the subpoena.  A civil action for disobeying a subpoena is authorized pursuant to 12 V.S.A. § 1623, but it is only available to "the party which issued the subpoena or on whose behalf it was issued."  To the extent that Mr. Coon alleges obstruction of justice, that is a criminal charge that cannot be brought by a private citizen.  *See Conn. Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d 81, 86 (2d Cir. 1972) (provisions of criminal law could not be enforced by any civil action); *State v. Parker*, 151 Vt. 378, 379, 560 A.2d 383, 385 (1989) (executive branch is the "exclusive charging authority").

Because there is no underlying tort stemming from the alleged delay, Mr. Coon's conspiracy claim also fails.  *See Akerley v. N. Country Stone, Inc.*, 620 F. Supp. 2d 591, 600 (D. Vt. 2009) (noting that, for a civil action for conspiracy, the parties to the alleged conspiracy must have an agreement, and must do something in furtherance thereof that is itself unlawful); *Montgomery v. Devoid*, 2006 VT 127, ¶ 20, 915 A.2d 270, 278 (noting "existence of a primary violation" as an essential element of a civil conspiracy claim).

21

### B.    Invasion of Privacy or Malpractice

Mr. Coon alleges that SVMC "invaded [Plaintiff] Coon's privacy with

McClintock's help." (Doc. 17 at 4.)  The Court understands his claim to be that Attorney

McClintock disclosed privileged information to SVMC, including Mr. Coon's medical

status and family dynamics (which Mr. Coon says that Attorney McClintock learned

from his representation of Mr. Coon in the 1980s), as well as his plan to sue SVMC and

his legal theories (which Attorney McClintock purportedly learned about during the

disputed February 3, 2010 telephone call).  According to Mr. Coon, Attorney McClintock

"sold me out for a bigger better payday with [SVMC]." (Doc. 40-3 at 2.)  As noted

above, Attorney McClintock maintains that he has no recollection of Mr. Coon's personal

and family circumstances from his representation of Mr. Coon in the 1980s.  Attorney

McClintock also asserts that, "[p]rior to the filing and service of this suit, I have not

divulged to SVMC any information that Mr. Coon[] provided me, regarding his, and/or

his mother's estate[]s, alleged potential claims against SVMC, or any of its employees."

(Doc. 54-5 at 11, ¶ 77.)

Vermont recognizes the tort of invasion of privacy as defined in the Restatement

(Second) of Torts.  *See Harris v. Carbonneau*, 165 Vt. 433, 439, 685 A.2d 296, 300

(1996) (citing Restatement (Second) of Torts § 652A (1977)).  But Mr. Coon has failed to

come forward with admissible evidence that would support such a claim.  His own

speculation about what Attorney McClintock might have done with any information that

Mr. Coon might have supplied is insufficient to create a factual issue.  *See Major League*

*Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) ("A party

opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory . . . or based on speculation . . . .").[21]

Mr. Coon also claims that Attorney McClintock is liable for malpractice and for violating the Vermont Rules of Professional Conduct.  Specifically, Mr. Coon argues that Attorney McClintock breached his duty by working for both him and for SVMC, and by disclosing confidential or privileged information to SVMC.  (Doc. 17 at 4, ¶ 9).  Those claims suffer from a number of infirmities.  First, Mr. Coon has not offered any expert testimony regarding the standard of care, breach, or causation.  *See Estate of Fleming v. Nicholson*, 168 Vt. 495, 497, 724 A.2d 1026, 1028 (1998) (noting that professional negligence is generally demonstrated using expert testimony to prove the requisite elements of the claim).  His claim that Attorney McClintock violated a rule of professional conduct or committed malpractice requires expert evidence.  *See Deptula v. Kane*, No. 2008-139, 2008 WL 4906905, at *2 (Vt. Nov. 2008) (unpublished mem.) (expert evidence was required to prove that attorney's conduct violated a rule of professional conduct or constituted malpractice).

Second, although Mr. Coon refers to the Vermont Rules of Professional Conduct, those Rules "are not designed to be a basis for civil liability."  V.R.P.C. Scope, ¶ [20].

---

[21]  Moreover, even if Mr. Coon's assertions did create a factual issue, they do not amount to invasion of privacy.  The only potentially applicable provision of the Restatement (Second) of Torts on that matter is § 652D ("Publicity Given to Private Life"), but that provision requires the tortfeasor to give "publicity"—i.e., to make the matter public "by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Restatement (Second) of Torts § 652D cmt. a (1977).  Here, Mr. Coon only asserts that Attorney McClintock communicated information to SVMC—he has offered no evidence that the allegedly communicated information became known by the public at large.

Indeed, although this Court has found no Vermont case on point, courts in several other jurisdictions have held that a violation of a code of ethics standard does not give rise to a cause of action for legal malpractice.  *See, e.g.*, *Hooper v. Gill*, 557 A.2d 1349, 1352 (Md. Ct. Spec. App. 1989) (collecting cases); *see also* Kathleen J. McKee, Annotation, *Admissibility and Effect of Evidence of Professional Ethics Rules in Legal Malpractice Action*, 50 A.L.R. 5th 301 § 5 (1997) (collecting cases).  Even if the Court were to consider the Rules of Professional Conduct as possible evidence of malpractice, Mr. Coon's malpractice claims would still fail for the reasons described below.

The Court concludes that Attorney McClintock's prior representation of Mr. Coon did not mean that Attorney McClintock's representation of SVMC breached a duty owed to Mr. Coon as a former client.  Rule 1.9 concerns attorneys' duties to their former clients, but only prohibits representing a party adverse to the former client when the representation is "in the same or a substantially related matter."  Matters are "substantially related" if they "involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter."  V.R.P.C. 1.9 cmt. [3].  The social security claim that Attorney McClintock worked on for Mr. Coon in the 1980s does not involve the same transaction or legal dispute as the work that Attorney McClintock did for SVMC reviewing requests for medical records.  For similar reasons, the fact that Attorney McClintock represented Mr. Coon in the 1980s did not create a concurrent conflict of interest with his representation of SVMC because there was no significant risk that the

24

representation of SVMC would be materially limited by Attorney McClintock's responsibilities to Mr. Coon as a former client.  *See* V.R.P.C. 1.7(a)(2).

Neither has Mr. Coon come forward with evidence to support a conclusion that Attorney McClintock agreed to represent both SVMC and Mr. Coon as adverse parties with respect to Mr. Coon's claims against SVMC.  Rule 1.7(a)(1) generally prohibits attorneys from representing a client where the representation is directly adverse to another client.  Although Mr. Coon asserts that he and Attorney McClintock had numerous conversations regarding the case without Attorney McClintock ever mentioning that SVMC was his client, the Court concludes that there is no genuine or triable issue as to whether any attorney-client relationship was formed between Mr. Coon and Attorney McClintock after Ms. Hunt's death.

On summary judgment, the Court ordinarily does not "weigh evidence or assess the credibility of witnesses."  *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).  However, the Second Circuit has held that

> in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," . . . and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.

*Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  In *Rojas v. Roman Catholic Diocese of Rochester*, the Second Circuit explained:

> [W]e do not suggest that district courts should routinely engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment. . . . However, in certain extraordinary cases, where "the facts alleged are so contradictory that doubt is cast upon their plausibility, the court may pierce the veil of the complaint's factual allegations and dismiss the claim." [*Jeffreys*, 426 F.3d] at 555 (internal quotation marks and alteration omitted). To hold otherwise, and require district courts to allow parties to defeat summary judgment simply by testifying to the allegations in their pleadings (or, as here, to facts *not* alleged in their pleadings), would "license the mendacious to seek windfalls in the litigation lottery." *Arrington v. United States*, 473 F.3d 329, 344 (D.C. Cir. 2006) (Brown, J., concurring in part and dissenting in part).

*Rojas*, 660 F.3d 98, 106 (2d Cir. 2011) (per curiam).

Here, as described above, Mr. Coon himself has offered contradictory evidence about whether Attorney McClintock disclosed that SVMC was a client and whether he agreed to represent Mr. Coon against SVMC. The affidavits of Julia Ruth Coon and Riza Ali Coon do not establish that the alleged phone calls and correspondence in 2010 and 2011 were at all related to potential claims against SVMC. Mr. Coon's own testimony regarding contact with Attorney McClintock during that time is contrasted against the documents that he himself has offered, as well as Attorney McClintock's own competent and persuasive evidence, including the undisputed October 11, 2011 and July 17, 2013 emails unambiguously advising Mr. Coon that Attorney McClintock could not represent him. The Court concludes that there is no triable dispute as to whether Attorney McClintock agreed to represent Mr. Coon in a suit against Attorney McClintock's client SVMC. No reasonable juror would conclude that he did, and thus Attorney McClintock cannot have breached a duty of loyalty in that respect.

26

The Court also concludes that there is no triable issue as to whether Mr. Coon was a "prospective client" under Rule 1.18.  To the extent that Mr. Coon shared information with Attorney McClintock after Ms. Hunt's death, the information shared was done so unilaterally without any reasonable expectation that Attorney McClintock would be willing to form a client-lawyer relationship.  (*E.g.*, Doc. 54-5 at 9, ¶ 51; Doc. 54-15.)  To each communication from Mr. Coon, Attorney McClintock responded that he could not represent Mr. Coon, or chose not to respond at all.  Attorney McClintock's continued representation of SVMC was therefore not a breach of duty to Mr. Coon as a "prospective client."  *See* V.R.P.C. 1.18 cmt. [2].

Mr. Coon also asserts that Attorney McClintock's alleged disclosures of confidential or privileged information to SVMC was a breach of duty.  (Doc. 17 at 4, ¶ 9).  It is true that Attorney McClintock owed Mr. Coon a duty not to reveal information relating to the representation in the 1980s.  V.R.P.C. 1.9(c)(2).  However, Mr. Coon's claim that Attorney McClintock breached that duty fails for the reason stated above with respect to the invasion-of-privacy claim: Mr. Coon has not come forward with admissible evidence in support.  Mr. Coon's claim that Attorney McClintock shared with SVMC information about Mr. Coon's plan to sue SVMC and his legal theories—presumably in violation of V.R.P.C. 1.18(b)—is conclusory in nature and fails for multiple reasons.  The Court has already concluded that Mr. Coon is not entitled to protection as a "prospective client."  Even if he were, Mr. Coon has not presented any admissible evidence that Attorney McClintock did in fact disclose any such information, or that any such disclosure harmed Mr. Coon.

27

### C.     Fraud

Mr. Coon alleges that SVMC and Attorney McClintock "did with intention withhold all [Joan M. Hunt] records with intent to run out what they believed was the statute of limitations on any civil litigation, committing a fraud against [Plaintiff] Coon." (Doc. 17 at 5.)  In Vermont, "[t]he essential elements of a fraud claim are (1) intentional misrepresentation of a material fact; (2) that was known to be false when made; (3) that was not open to the defrauded party's knowledge; (4) that the defrauded party acts in reliance on that fact; and (5) is thereby harmed." *Estate of Alden v. Dee*, 2011 VT 64, ¶ 32, 35 A.3d 950, 960–61.  The misrepresentation element can be satisfied by a showing of fraudulent concealment, which is the "concealment of facts by one with knowledge, or the means of knowledge, and a duty to disclose, coupled with an intention to mislead or defraud." *Lay v. Pettengill*, 2011 VT 127, ¶ 14, 38 A.3d 1139, 1144.

Mr. Coon cannot prove that he was harmed by any alleged fraudulent concealment.  As described in the statute-of-limitations analysis above, any delay in producing the records did not imperil Mr. Coon's civil action on statute-of-limitations grounds.  Mr. Coon himself admits that as early as February 3, 2010, he believed SVMC was "at fault" and that his cousin, the SVMC nurse, was involved.  (Doc. 13 at 1; Doc. 40 at 14.)  In short, nothing that SVMC did after February 3, 2010 prevented Mr. Coon from becoming aware of his cause of action; by his own admission he was already aware of it at that time.  Even assuming that SVMC took longer than necessary to produce the documentation, that would not have prevented Mr. Coon from filing his Complaint.

### D.  Interference with or Removal of Autopsy Request

As SVMC points out (Doc. 12 at 5 n.4.), it is not clear from the Amended

Complaint whether Mr. Coon's statement that "someone" at SVMC removed the autopsy

request is an attempt to state an additional tort claim.  To the extent that it is, SVMC

argues that it must be dismissed.  The Court agrees.  The harm that Mr. Coon says

resulted from the alleged interference with or removal of the autopsy request is that law

enforcement was prevented from bringing a criminal action for the alleged murder of his

mother.  In short, Mr. Coon alleges obstruction of justice.  As noted above, that is a

criminal charge that cannot be brought by a private citizen.  *See Conn. Action Now*, 457

F.2d at 86 (provisions of criminal law could not be enforced by any civil action); *Parker*,

151 Vt. at 379, 560 A.2d at 385 (executive branch is the "exclusive charging authority").

## IV.  Shea's Motion

As the Court previously recognized, Mr. Coon asserts the following causes of

action against Shea: wrongful cremation, intentional infliction of emotional distress

("IIED"), wrongful conversion of a grave marker, and overcharge or mischarge of fees

for funeral services.  (Doc. 18 at 2.)  As with the claims against SVMC and Attorney

McClintock, the Court applies Vermont law to most of Mr. Coon's claims against Shea.

*See* Restatement (Second) of Conflict of Laws § 145.[22]  Shea seeks dismissal or summary

judgment on each of Mr. Coon's claims against it.

---

[22]  Mr. Coon generally agrees that Vermont law should apply, but asserts that New York law applies with respect to the alleged desecration of graves at Mr. Coon's family's cemetery in Buskirk, New York, and that as a result Shea cannot invoke 18 V.S.A. § 5233.  (Doc. 25 at 5.)  That issue is discussed below.

A.      **Wrongful Cremation**

Mr. Coon's wrongful-cremation claim is a special case of a claim for infliction of emotional distress.  *See* W. Page Keeton et al., Prosser and Keeton on Torts § 12, at 63 (5th ed. 1984) (tort claims alleging the intentional mishandling of dead bodies are in reality the intentional infliction of emotional distress); *id.* § 54, at 362 (tort claims alleging the negligent mishandling of corpses are claims for the negligent infliction of emotional distress).  The Court therefore rejects Shea's contention (Doc. 37 at 2) that Mr. Coon lacks standing to bring the wrongful-cremation claim.

The following additional facts are material to the statute-of-limitations issue and to the analysis under 18 V.S.A. § 5233, and are undisputed except where noted.  Ms. Hunt died at 12:22 a.m. on January 30, 2010.  (*See* Doc. 58-3.)  On that date, Dr. Keith Collins of SVMC signed a "Preliminary Report of Death" indicating that Ms. Hunt had died of natural causes, and that no autopsy was performed.  (Doc. 58-4.)  After Ms. Hunt passed away, Mark Shea received a call from SVMC, and subsequently transported the body from the hospital to the funeral home.  (Doc. 58-2 at 1, ¶¶ 3–4.)  At that time, Mr. Shea was not aware that Mr. Coon existed, and was not aware of any request that an autopsy be performed.  (*Id.* ¶ 5.)

Also on January 30, 2010, Ms. Becker provided Shea with a signed "Cremation and Disposition Authorization."  (*See* Doc. 58-2 at 1, ¶ 6; Doc. 58-5.)  In that document, Ms. Becker identified herself as Ms. Hunt's daughter, and certified that she did not have "actual knowledge of any living person who has a superior right to act as the Authorizing Agent."  (Doc. 58-5 at 1.)  Mr. Shea also states that "Ms. Becker was listed as the

30

hospital contact person for the decedent, was the beneficiary of her life insurance policy, and it was my understanding that she lived with the decedent as well." (Doc. 58-2 at 1, ¶ 7.)

On February 1, 2010, the medical examiner issued Shea a permit to cremate Ms. Hunt's body. (Doc. 58-7.) The permit stated: "Being sufficiently informed as to the causes and circumstances of the death of the above described decedent, permission is hereby granted to cremate the body as requested." (*Id.*) February 1, 2010 is also the date that Ms. Hunt's death certificate was issued. (Doc. 58-3.) The death certificate indicates that Ms. Hunt's body was cremated, and further indicates a "Disposition Date" of February 1, 2010. (*Id.*)

Some affidavits supplied by Mr. Coon suggest that the cremation of Ms. Hunt's body may not have actually been performed until after February 3, 2010. According to Mr. Coon, Ms. Hunt's body "was cremated according to [the] crematory on Feb 6 2010." (Doc. 61 at 4); (*see also* Doc. 61-5 at 2, ¶ 3) ("She wasn[']t cremated till Feb 6 2010 in Troy . . . ."). However, Mr. Coon's assertion as to what the crematory told him is inadmissible hearsay. Although it is unclear how she might have personal knowledge, Julia Ruth Coon says that, as of February 3, 2010, the cremation had not yet happened. (Doc. 61-1 at 4.) Confusingly, Riza Ali Coon's affidavit suggests that the cremation occurred prior to February 3, 2010. (*See* Doc. 64 at 3) (stating that, on February 3, 2010, Mr. Shea had already cremated Ms. Hunt's body, and that all medical evidence was gone).

There are conflicting assertions about when Mr. Coon discovered that his mother's body was cremated.  Shea's position is that Mr. Coon knew of the cremation shortly after it occurred.  According to Mr. Coon, "we weren[']t told right away that the autopsy wasn[']t done."  (Doc. 15-3 at 2.)[23]  Julia Ruth Coon asserts the same.  (*See* Doc. 61-1 at 4) ("We didn[']t know about autopsy have been [sic] cancelled till Oct 2011.").  Oddly, Mr. Coon also says that, on February 3, 2010, he met with Mr. Shea and asserted that it was a mistake for Shea to have Ms. Hunt's body.  (Doc. 61 at 3.)  Riza Ali Coon states that the February 3, 2010 meeting with Mr. Shea "didn[']t go well" in part because Mr. Shea "had already cremated [Ms. Hunt's body]."  (Doc. 64 at 3.)

In Vermont, for the purposes of limitations on actions, a claim for damages resulting from emotional distress is an "injury to the person" within 12 V.S.A. § 512, and thus must be commenced within three years after the cause of action accrues.  *Fitzgerald v. Congleton*, 155 Vt. 283, 293, 583 A.2d 595, 601 (1990).  Under § 512(4), such a "cause of action shall be deemed to accrue as of the date of the discovery of the injury."  The Court concludes that the only evidence on the accrual question is that Mr. Coon knew as early as February 3, 2010 that his mother's body was cremated and that no autopsy had been performed.[24]  Mr. Coon's wrongful-cremation claim should have been

---

[23]  In an unsworn document, Mr. Coon asserts that "we didn[']t find out about [Ms. Hunt] not being autopsied [until the] [W]ash[ington] [Coun]ty [New York] [District Attorney] found out when he contacted [SVMC]."  (Doc. 41 at 4.)

[24]  Julia Ruth Coon's assertion that she did not know about the autopsy's cancellation until October 2011 conflicts with Riza Ali Coon's statement that the February 3, 2010 meeting with Mr. Shea did not go well because the cremation had already occurred.  In light of those conflicting materials offered by Mr. Coon himself, the Court concludes that there is no triable issue on the accrual question.

filed no later than February 3, 2013.  His filing on June 27, 2013 is barred by the statute
of limitations.

There is no basis for tolling the statute of limitations for filing the wrongful-
cremation claim against Shea.  Mr. Coon's May 13, 2013 suit against SVMC in the
United States District Court for the Northern District of New York did not involve Shea,
and in any case would only move the effective filing date to May 13, 2013—still well
after February 3, 2013.  There is no allegation or evidence that Shea did anything to
prevent Mr. Coon from discovering or filing his cause of action.  Finally, as described
above, there is no admissible evidence that would support a medical equitable tolling
conclusion.

In addition, the wrongful-cremation claim is barred by 18 V.S.A. § 5233, which
provides as follows:

> A funeral director or crematory operator shall not be subject to civil
> liability or subject to disciplinary action for carrying out the disposition
> of the remains if he or she relied in good faith on a funeral service contract or
> authorization or for following the instructions of an individual whom the
> funeral director or crematory operator reasonably believes or believed holds
> the right of disposition.

According to Shea, Mr. Coon "makes no allegations that would support the finding that
Defendant Shea did not act in good faith when he cremated the Decedent."  (Doc. 9 at 3.)

Mr. Coon's position on this issue is as follows (with some minor edits for clarity):

> Mr. Shea isn't covered with free immunity under 18 V.S.A. § 5233.
> Plaintiff Coon has shown Mark Shea is the very exact reason why the
> funeral industry is so looked at watched and why all state government[s] try
> to regulate how and what they do.  He has no immunity in this, he has done
> multiple things: lied on state surrogate court forms, stating all expenses
> were paid in [Ms. Hunt's] funeral, then repeatedly hitting up other relatives

33

for more and more monies.  He is a bad seed and the court must in the interest of justice allow [the] case to go forward to trial on the facts.

(Doc. 15 at 6.)

Mr. Coon's reiteration of his other claims against Shea and his general assertion that Mr. Shea is a "bad seed" is insufficient to overcome Shea's affidavit which establishes that Shea either relied on a funeral service contract or authorization or followed the instructions of an individual whom it reasonably believed held the right of disposition.  (Doc.  58-2.) Mr. Coon asserts that Ms. Becker did not have the right to authorize a cremation, but the inquiry under § 5233 is what Shea *reasonably believed* based on the information available to it.  Here, Shea relied in good faith on the "Cremation and Disposition Authorization" that Ms. Becker signed on January 30, 2010. Shea did not and could not have known about Mr. Coon's autopsy request.[25]  Moreover, Shea believed that Ms. Becker held the right of disposition, and that belief was reasonable in light of Ms. Becker's representations, including her relationship to Ms. Hunt as well as her status as the hospital contact person and life insurance beneficiary.

Mr. Coon suggests that, when he raised questions about Ms. Becker's authority at the February 3, 2010 meeting with Shea, Shea could have placed a phone call to halt the cremation.  Shea nevertheless still had a good faith basis for relying on the signed authorization from Ms. Becker.  Moreover, there was nothing that Shea could have done. The evidence in the record is that Ms. Hunt's body had already been cremated by

---

[25] In an affidavit, Riza Ali Coon suggests that "maybe Shea removed the requests for [an] autopsy."  (Doc. 64 at 3.)  Such speculation is insufficient to avoid summary judgment. *See Major League Baseball Props., Inc.*, 542 F.3d at 310 ("A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory . . . or based on speculation . . . .").

February 3, 2010.  The official documents list the date of disposition as February 1, 2010. (*E.g.*, Doc. 58-3.)  The affidavits suggesting a February 6, 2010 date of cremation conflict with other affidavits offered by Mr. Coon and are hearsay or do not appear to be based on personal knowledge.

### B.   Grave Desecration

As noted above, Mr. Coon asserts that New York law applies with respect to the alleged desecration of graves at Mr. Coon's family's cemetery in Buskirk, New York, and that as a result Shea cannot invoke 18 V.S.A. § 5233.  (Doc. 25 at 5.)  At oral argument on January 15, 2014, counsel for Shea suggested that New York law might indeed control.  The Court agrees.  "A federal court sitting in diversity jurisdiction applies the choice of law rules of the forum state." *Forest Park Pictures*, 683 F.3d at 433.  In Vermont, choice-of-law issues in tort actions are resolved using the approach set forth in the Restatement (Second) of Conflict of Laws. *Martineau v. Guertin*, 170 Vt. at 417, 751 A.2d at 778 (citing *Amiot v. Ames*, 166 Vt. at 292, 693 A.2d at 677).  Pursuant to § 146 of that Restatement, New York law should apply to the grave-desecration claim because that is where the injury occurred.

Because New York law applies to this claim, 18 V.S.A. § 5233 is not available to Shea.  Section 5233 would not apply to the grave-desecration claim in any case, since Shea's actions underlying the claim do not constitute "carrying out the disposition of the remains."  Moreover, since alleged desecration of Mr. Coon's family members' graves occurred in May 2012, there is no limitations problem with this claim under New York's three-year statute of limitations. *See* N.Y. C.P.L.R. 214(5).  In addition, as with his

emotional-distress claim based on wrongful cremation, Mr. Coon has standing to bring his grave-desecration claim. *See Mitchell v. Thorne*, 32 N.E. 10 (N.Y. 1892) ("[T]he heirs of a decedent, at whose grave a monument has been erected, or the person who rightfully erected it, can recover damages from one who wrongfully injures or removes it . . . .").

Shea argues that the Court should decline to exercise supplemental jurisdiction over Mr. Coon's remaining state law claims (which the Court interprets to include his grave-desecration claim) because they do not meet the $75,000 statutory amount-in-controversy requirement. (Doc. 37 at 4; Doc. 58 at 9.) However, the measure of damages for such a claim is unclear at present. *See Cooper v. Myer*, 2007 VT 131, ¶ 12, 944 A.2d 915, 919 (mem.) (noting that the recoverable damages for IIED suits are "soft" damages that are "not easily calculated," and affirming a significant award for IIED); *see also Mitchell v. Stevenson*, 677 N.E.2d 551, 564 (Ind. Ct. App. 1997) (affirming significant award for IIED stemming from grave desecration). There are insufficient facts at present to determine whether Mr. Coon's grave-desecration claim meets the $75,000 amount-in-controversy requirement specified in 28 U.S.C. § 1332. The Court therefore DENIES Shea's Motion as to that claim.

### C.    Conversion of Grave Marker; Overcharge or Mischarge of Fees

Shea argues that Mr. Coon's claim for conversion of a grave marker is moot because the Complaint implicitly states that the marker has been returned to the grave site. (Doc. 9 at 5.) Assuming that the Amended Complaint can be read as Shea says, Shea has not called to this Court's attention any law in Vermont or New York that

deviates from the proposition that the tort of conversion is complete when the defendant takes, detains or disposes of the chattel.  *See* W. Page Keeton et al., Prosser and Keeton on Torts § 15, at 106 (5th ed. 1984).  Mr. Coon's conversion claim is not moot.

The provisions of 18 V.S.A. § 5233 do not aid Shea with respect to the conversion and mischarge claims.  Vermont law would not appear to apply to the conversion claim for the same reason that it does not apply to the grave-desecration claim.  *See* Restatement (Second) of Conflict of Laws § 147.  More importantly, Shea's actions underlying both the conversion and mischarge claims do not constitute "carrying out the disposition of the remains."

Shea contends that Mr. Coon lacks standing to assert his conversion and mischarge claims because he has not been appointed the administrator or executor of Ms. Hunt's estate.  (Doc. 37 at 6.)  That argument also fails.  As discussed above, it appears that Mr. Coon is serving as the "voluntary administrator" for his mother's estate.[26] Although he has no power to enforce a claim for wrongful death or a claim for "personal injuries to the decedent," N.Y. Surr. Ct. Proc. Act § 1306(3), his claims for conversion of a grave marker and for mischarge of fees do not fall into either of those prohibited categories.

---

[26] It is not entirely clear from the record whether Mr. Coon has actually complied with the requirements for serving as a "voluntary administrator."  Specifically, New York law contemplates a "short certificate" that constitutes evidence of a voluntary administrator's qualification and authority, N.Y. Surr. Ct. Proc. Act § 1304(5), yet Mr. Coon has not filed any such certificate with this Court. However, the procedure for qualifying as a voluntary administrator is not burdensome: no bond is necessary, only an affidavit need be filed (accompanied by a $1 fee), and no order of the court or other proceeding is required.  *Id.* §1304(2)–(4).  Here, in light of Mr. Coon's assertions regarding the proceedings in Surrogate's Court and that he was told to continue handling the business of Ms. Hunt's estate, it seems likely that he is in fact the "voluntary administrator."

In a related vein, Shea also suggests that Mr. Coon needs to obtain ancillary letters of administration in Vermont in order to prosecute the claims of his mother's estate in Vermont.  (Doc. 37 at 3.)  This is a conflict-of-law issue; as to both the conversion (tort) and mischarge (contract) claims, the Court resolves the issue using the approach set forth in the Restatement (Second) of Conflict of Laws.  *Amiot*, 166 Vt. at 292, 693 A.2d at 677.

Under that approach, a foreign executor or administrator may maintain an action to enforce a claim belonging to the decedent only:

> (1) when the defendant does not make seasonable objection, or
> (2) when the claim is on a negotiable instrument, share certificate or negotiable document of title in the possession of the foreign executor or administrator, or
> (3) when maintenance of the suit is in the best interests of the estate and will not prejudice the interests of local creditors, or
> (4) when otherwise authorized by the local law of the forum.

Restatement (Second) of Conflict of Laws § 354 (1971).[27]  Here, Shea has seasonably objected to Mr. Coon's maintenance of the action in Vermont.  The claims are not one of those enumerated in subsection (2).  Moreover, the Court has discovered no provision of Vermont law that authorizes a foreign executor to maintain an action to enforce a claim in Vermont.  However, as to subsection (3), maintenance of the suit in Vermont would not seem likely to prejudice the interests of any Vermont creditors.  Here, it does not appear that Ms. Hunt's estate has any assets in Vermont that might provide a basis for a

---

[27]   The rule in Vermont was different at the time that this Court decided the wrongful-death cases in *Dutil v. Mayette*, 395 F. Supp. 922 (D. Vt. 1975) and *Weinstein v. Medical Center Hospital of Vermont, Inc.*, 358 F. Supp. 297 (D. Vt. 1972).  *See* Restatement (First) of Conflict of Laws § 396 (1934) ("If the death statute of the state of wrong provides that suit for the death shall be brought by the personal representative of the deceased, recovery can be had only by a person qualified to sue at the forum as personal representative of the deceased.").  The conversion and mischarge claims are not wrongful-death claims, and in any case, Vermont has since adopted the approach in the Restatement (Second) of Conflict of Laws.  *Martineau*, 170 Vt. at 417, 751 A.2d at 778.

local administration, and it is not clear that there is any other forum in which the claims could be enforced.  *See* Restatement (Second) of Conflict of Laws § 354 cmt. e ("[A] foreign executor or administrator will be permitted to sue upon a claim of the decedent in a state in which there are insufficient assets to provide the basis for a local administration under the local law of that state at least in a situation where there is no other forum in which the claim could be enforced.").  The Court therefore concludes that Mr. Coon's claims for conversion and mischarge should not be dismissed for failure to obtain ancillary letters of administration.

Finally, it might be that the sum of the potential damages on the conversion and mischarge claims does not exceed 28 U.S.C. § 1332's minimum.  However, since the Court is declining to dismiss the grave-desecration claim, the Court concludes that it has supplemental jurisdiction over the conversion and mischarge claims pursuant to 28 U.S.C. § 1367(a) because they derive from a "common nucleus of operative fact" along with Mr. Coon's grave-desecration claim.  *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011).  The claims arise out of Ms. Hunt's death and Shea's subsequent involvement providing funeral services.

## V.   Mr. Coon's "Motion to Gain All Records of [Joan M. Hunt]"

In his "Motion to Gain All Records of [Joan M. Hunt]," Mr. Coon asserts that he needs account records from banks and creditors of his mother's estate in order to respond to claims asserted by those creditors against the estate.  (*See* Doc. 70 at 2–3.)  The records that Mr. Coon seeks are not relevant to any claim or defense in this action, nor would

39

they be likely to lead to the discovery of admissible evidence relevant to any issue in this case.  *See* Fed. R. Evid. 26(b)(1).  The Motion is accordingly DENIED.

## Conclusion

SVMC's Motion to Strike (Doc. 62) is DENIED.  Mr. Coon's "Motion to Gain All Records of [Joan M. Hunt]" (Doc. 70) is DENIED.

SVMC's original (Doc. 7) and renewed (Doc. 29) Motion to Dismiss and alternative Motion for Summary Judgment is GRANTED; Attorney McClintock's Motion to Dismiss or for Summary Judgment (Doc. 49) is also GRANTED.  The wrongful-death claim against SVMC is DISMISSED without prejudice for lack of capacity and because, on the present facts, it is time-barred.  Mr. Coon's remaining claims against SVMC and Attorney McClintock are DISMISSED.

Shea's original (Doc. 9) and renewed (Doc. 37) Motion to Dismiss and alternative Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.  Mr. Coon's wrongful-cremation claim is DISMISSED.  The portion of Shea's Motions seeking dismissal of the claims for conversion and mischarge and the claim for desecration of graves is DENIED.

Dated at Burlington, in the District of Vermont, this 30th day of January, 2014.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge